[Civ. No. 12681.   Second Dist., Div. One.—July 9, 1941.]

RAY PIGNET et al., Respondents, v. CITY OF SANTA MONICA (a Municipal Corporation) et al., Appellants.

Cornelius W. McInerny, Jr.; Gibson, Dunn & Crutcher and Philip C. Sterry for Appellants.

Forrest S. Macfarland, David Blonder, Max Sisenwein and Joseph L. Fainer for Respondents.

DESMOND, J., *pro tem.*—A jury rendered a verdict in the sum of $25,000 in favor of Ray Pignet, suing as an individual, in a damage action. The same jury returned a separate verdict in the sum of $1,600 in favor of Pignet and his partner, Edward Spencer, doing business as Pacific Flying Service. These verdicts were rendered against appellants,

city of Santa Monica and E. R. Carter. It appears from respondents' brief that on a former trial Weldon Van Gundy, another defendant, had defaulted, and that after the introduction of evidence the jury returned a verdict against him for damages in the sum of $27,350. In that trial the court had entered a judgment of dismissal as to appellants here, after a nonsuit granted in their favor. That judgment, however, was reversed on the ground that the jury should have been permitted to decide whether negligence existed on the .part of defendants Carter and city of Santa Monica (*Pignet* v. *City of Santa Monica,* 29 Cal. App. (2d) 286 [84 Pac. (2d) 166]) and the trial which gave rise to this appeal ensued. The appeal is from both judgments in this action, insufficiency of the evidence being specified, and appellants contending that error arose by reason of the court's rulings on questions of evidence and in giving and refusing to give certain instructions. Appellants also claim that ''The amount of the verdict rendered in favor of the plaintiff, Ray Pignet, is so excessive that it must be held to have been the result of passion or prejudice upon the part of the jury.''

The accident in which respondent Pignet was injured and the airplane of his firm damaged occurred on Clover Field Airport, owned and operated by the city of Santa Monica. Pignet and his partner, Spencer, rented, from the city, office and airplane hangar space located upon Clover Field Airport under a sublease which permitted them to use the runways maintained thereon for the ''landing and taking off from said Municipal Airport for the demonstration of aircraft, for all noncommercial uses, commercial uses and for charter parties, etc.'' Acting under this *proviso,* respondent Pignet, on January 19, 1937, undertook to instruct an airplane student, and in the course of their flight descended to Clover Field, where, unfortunately, a collision occurred on one of the runways between the airplane of respondents and an automobile driven by Van Gundy, in which the student was killed and Pignet gravely injured.

According to appellants, ''The accident occurred at 4:45 PM *after the W.P.A. had finished work for that day.*'' Respondents state in their brief, ''On January 19, 1937, at about the hour of 4:20 PM, respondent Ray Pignet was operating an airplane in the air, engaged in giving flying instructions to a student. At said time Pignet approached

the airport field, and circled the same to see if it was clear preparatory to making a landing. Pignet landed the airplane at a speed of approximately 50 miles per hour.'' Whatever the exact time of the collision may have been the statement of appellants that it occurred after working hours is not challenged by respondents.

Some months prior to the accident the city of Santa Monica had entered into an agreement with the Works Progress Administration of the United States Government, known colloquially as W.P.A., under the terms of which certain men, including Van Gundy, were employed for the purpose of constructing and repairing the airplane runways located on Clover Field. According to respondents, ''The concrete runways which were used for the landing and taking off of airplanes were each 200 feet wide, one runway extending from the southwest corner of the field to the northeast portion, and the other runway from the northwest portion of the field to the southeast corner. These runways cross each other at an approximate thirty-three degree angle. On January 19, 1937, when the accident in question occurred, all portions of these runways were completed and covered with concrete and available for the landing and taking off of planes, excepting a certain section of the runway which extended to the northeast corner of the field. This portion of said runway was incomplete and still under construction at the time of the accident.''

The collision occurred at a point within the intersection of the two runways, where they had been completed by the W.P.A. and had been turned over by appellants to pilots for landing and taking off of airplanes. Van Gundy was driving his car on the north-south runway when he collided with Pignet's airplane, which was landing on the east-west runway. The labor which was hired by the W.P.A. for construction work was under the direction of the W.P.A. engineer in charge of the project. Quoting again from the respondents' brief, ''It appears from the evidence, however, that considerable cooperation and joint effort existed between appellants and the W.P.A. in generally determining what should or should not be done to comply with the plans and specifications which were prepared by the employees of appellant, City of Santa Monica.'' It appears from the tran-

script that Van Gundy had completed his day's work at about 3:30 p. m., then had partaken of some intoxicating liquor with a fellow workman and at the time of the accident was on his way to a building at the southern end of the field, using the runway as a shortcut. Under regulations set up by the W.P.A. all vehicles engaged in the work that was being done upon the airport were required to carry a red flag to indicate that they were on the field under proper authorization. Van Gundy testified that to meet this requirement, "I went down there to the tank truck and picked up my coat and a red flag which I picked up for the purpose of putting on my automobile because I knew no automobile without the red flag was allowed on the airport." He entered the field at the corner where work upon the job was still unfinished; that is, at the northeast corner. A fence or barrier which had been placed at this point of entrance was down at the time Van Gundy went upon the field. As to this, Mr. Johnson, the W.P.A. foreman, testified: "At the time of the accident the northerly portion of the north-south runway had not been completed. At the northeast corner up by Centinella Avenue there was a fence that consisted of poles with a wire cable running from them. A section or so of that fence had been taken down by the W.P.A. because that field had to be made out in that corner and it was necessary to take it down to complete the work." Van Gundy testified further, "I drove in a southwesterly direction on the north half of the runway. When I took my car and began driving it in a southwesterly direction I did not see any watchman at the point marked V–1 on Plaintiff's Exhibit 1. No one attempted to stop my car as I was proceeding to the point of the accident and I do not remember any one hollering at me."

Mr. Johnson stated: "During working hours the W.P.A. maintained flagmen around the work where it was being carried on. I had eight to twelve men on the field at all times with flags. Their duties was to watch out for anything that might come in on the field that didn't belong there. Their duties ended about 4:30 in the afternoon. At hours other than working hours we had a watchman at each entrance, that is at Centinella and 27th Street. I had instructed those watchmen not to permit anybody on the field." The witness Katzenberger testified that he was employed at

Clover Field as a night watchman; that he started work on the day of the accident at about 3:45 p. m., at that time relieving the flagman. ''When I saw this man (i. e.: Van Gundy) I did not holler at him because I know that he work there. I thought the mixer had broke down. I had never seen Mr. Van Gundy; I saw him as his car moved down to the airway; if he had not had a red flag on I would have stopped him and wanted to know what business he had there. 1 was about 200 feet away from him when I saw him.''

The respondents contend that, ''The evidence shows that a dangerous, hazardous condition existed on the airport because (1) there were no proper watchmen, signs, fences, barriers, or other preventative devices to keep automobiles off the airplane runways; (2) automobiles were continuously on the field and on the runways prior to the accident, thereby creating the hazardous conditions; (3) appellants had knowledge of such hazardous conditions; and (4) appellants failed and omitted to do anything to remedy the dangerous situation, etc.''

Appellants in their reply brief criticize particularly the statement which says that ''automobiles were continuously on the field and in the runways prior to the accident, thereby creating the hazardous condition,'' pointing out that ''Respondents have not seen fit to set forth in their brief any evidence whatsoever tending in the slightest degree to establish the fact that vehicles other than those used in the construction work were seen on the field or that any vehicles were on the field at any time other than during working hours.

''The 'aforementioned testimony' referred to in the above quotation is that of the plaintiff, Pignet, and the witnesses, Goddard, Darby and Spencer, all of whom testified that prior to the accident they had observed vehicles on the field which were used in connection with the work being carried on. No witness testified to having seen any other vehicles on the field after working hours.

''Pignet stated: 'I knew construction work was being carried on by the W.P.A. before the accident and had seen trucks of various kinds hauling materials on to the airport and hauling dirt away from the airport.'

''Goddard's version was: 'I should say that that work had been going on six or seven months at the time the accident

happened. During that time on occasions I had seen automobiles with red flags moving up and down the runways where they were working and had made complaints of that fact to Colonel Carter.'

"The testimony of Darby and the plaintiff, Spencer, is to the same effect.

"Of course, this testimony is not even suggestive of the facts stated in the quotation from respondents' brief. On the contrary it clearly shows that the only vehicles seen by the witnesses and reported by them to Colonel Carter were those engaged in construction work during working hours.''

Appellants argue further ''that there is no evidence tending in the slightest degree to establish the fact that Carter should have anticipated Van Gundy's act, nor evidence of any negligence upon his part which proximately caused the accident. If there is any such evidence respondents have failed to present it in their brief.

"Of course it was incumbent upon respondents to establish by a preponderance of the evidence facts which would charge a reasonably prudent person with knowledge that there was a reasonable probability that unauthorized vehicles would be driven on to the airport after the construction work for the day had been finished. There is not a scintilla of evidence tending to establish such facts.

"It would be an absurdity to say that the fact that defendants were aware that vehicles, necessary to the prosecution of work, were used on the airport during the hours of work charged them with knowledge of the fact that it was reasonable to suppose that unauthorized vehicles would enter the airport after working hours.''

We have presented the foregoing comments and arguments of counsel on the particular matters involved because they have a direct bearing upon exceptions taken to certain instructions given and refused by the trial court.

To assist the jury in determining the questions inherent in this tort action the plaintiffs submitted thirty-one instructions, all of which were given by the trial judge; the defendants submitted fifty, of which the first sixteen were given and the remaining thirty-four refused. The court of its own motion gave the jury fifteen instructions. We have examined all these instructions and find that, in regard to some, prejudicial error has occurred, necessitating a new trial.

■ The court read to the jury plaintiff's instruction No. 22, as follows:

"You are instructed that it is the duty of an airport owner, while operating an airport, to protect persons from dangers arising from the negligence of a third party which could reasonably have been anticipated. Thus, if you find from the evidence in this case that the defendants, E. R. Carter and City of Santa Monica, had knowledge or notice of the condition which existed on the Clover Field Airport by virtue of the fact that automobiles were being driven on the concrete runways used for the landing and taking off of airplanes, *and if you find that such defendants should reasonably have anticipated that someone would drive upon the concrete runways reserved for airplanes,* and if you find that furthermore the defendants did not exercise reasonable care in protecting Ray Pignet from the negligence of Weldon Van Gundy, then you must return a verdict in favor of the plaintiffs and against the defendants, E. R. Carter and City of Santa Monica."

It will be noted that in this instruction there is no suggestion of possible contributory negligence on the part of plaintiff Pignet. Appellants feel that because of this omission the instruction was so faulty as to require a reversal. However, we find that the doctrine of contributory negligence was sufficiently explained in plaintiff's instruction No. 11 and also in defendants' instruction No. VIII, and are not prepared to say that the omission in this particular instruction, plaintiff's No. 22, is so serious as to constitute prejudicial error.

■ Appellants complain that the instruction was misleading, for, to use their language, "it completely ignores the fact that it was necessary for automobiles to be upon the runways during working hours. . . . and it also ignores the fact that the accident occurred after the day's work had ceased, etc." If the members of the jury were attentive, however, they would have heard the testimony offered on these points and therefore should not have been misled because they were omitted from the instruction. Furthermore, appellants might have submitted a pertinent instruction on the subjects mentioned. So, we do not hold that error arose in connection with plaintiff's instruction No. 22, but we have

reproduced it here for the purpose of contrasting certain language therein appearing and which we have emphasized, with certain other language which we have placed in italic print in plaintiff's instruction No. 24.

That instruction reads as follows: *"You are instructed that* the defendants, City of Santa Monica and E. R. Carter, had no right to assume that motor vehicles would not be driven upon the runways reserved for the landing and taking off of airplanes on Clover Field Airport, but *under all the circumstances and at all times said defendants were bound to anticipate that persons might drive automobiles onto said airport and across said runways,* and said defendants were at all times required to use such ordinary care as would enable them to prevent persons from driving upon said airport or across said runways in motor vehicles. If you find from the evidence in this case that the defendants, City of Santa Monica and E. R. Carter, did not use ordinary care to keep motor vehicles from being driven upon Clover Field Airport, or its runways, then you are instructed that said defendants were guilty of negligence, and if such negligence on their part proximately caused the accident, damages and injuries sustained by the plaintiffs, and the plaintiffs were not themselves guilty of any contributory negligence, then your verdict must be against the defendants, City of Santa Monica and E. R. Carter, and in favor of the plaintiffs."

Placing these instructions side by side we find that the first, No. 22, committed to the jury determination of the question whether "defendants should reasonably have anticipated that someone would drive upon the concrete runways reserved for airplanes," while the other, No. 24, by its terms, decided that question for the jurors for it instructed them "that . . . under all the circumstances and at all times said defendants were bound to anticipate that persons might drive automobiles onto said airport and across said runways" and further instructed the jury that defendants were at *all times* required to use such effective ordinary care as would keep the airport and runways clear of motor vehicles. The valid objections to this latter part of the charge are at once apparent in view of the testimony that motor vehicles were necessarily employed on the airport and across or along the uncompleted runways during working hours. Both portions of No. 24 to

which we have called attention are objectionable as invading the province of the jury.

Appellants' comment on the situation is as follows: "By plaintiffs' instruction 24 the jury was told that as a matter of law the defendants were bound to anticipate Van Gundy's acts. As to whether defendants should have anticipated such negligence upon his part under all the circumstances disclosed by the evidence was one of the vital issues before the jury for their determination (*Pignet* v. *City of Santa Monica, supra,* 29 Cal. App. (2d) 286–90); however, this issue was taken from them by this instruction. As pointed out there is not the slightest suggestion in the record even remotely tending to show that any other automobiles had ever been driven upon the airport *except during working hours in the prosecution of the work,* nor is there a scintilla of evidence tending to establish *any* fact or circumstance from which it could be said that a reasonably prudent person in defendants' position would have anticipated that Van Gundy would . . . drive his car on to the field after the day's work had been completed. From the instruction the jury must have assumed that the court had determined that there was such evidence and that defendants were guilty of negligence as a matter of law . . . *in failing to take steps to prevent the accident.* The instruction is not open to any other interpretation."

Here appellants cite the case of *Nickell* v. *Rosenfield,* 82 Cal. App. 369, at 377 [255 Pac. 760], where the court said: "Every trial judge knows from experience that many general instructions are quite puzzling to the average juror striving to get every word of counsel from the court; but when the court takes up the particular situation involved, and bases a charge thereon by applying the facts to the law, instantly the jury becomes directly interested"; and *McKeon* v. *Lissner,* 193 Cal. 297, at 306 [223 Pac. 965], the court there using the following language: "Thus the instruction assumed the existence of the very fact which was in issue in the case, and upon which the plaintiff's right to recover depended, namely, the negligence of the defendants."

█ Exception is taken to plaintiff's instruction 26 reading as follows: "It is established that E. R. Carter, who was operating manager of the Clover Field Airport, involved in the accident in question, was acting as agent for the defendant

City of Santa Monica and within the scope of his authority, at the time of the events out of which the accident occurred. Therefore, the acts and omissions of that agent were, in contemplation of law, the acts and omissions, respectively, of his principal, the defendant City of Santa Monica.'' Respondents point out that this instruction is a copy of the instruction numbered 53A of B. A. J. I. (Book of Approved Jury Instructions), and that it merely states a rule of agency. In this connection, however, it must be noted that the court previously instructed the jury, in plaintiffs' instruction No. 24, which we have just quoted, that ''under all the circumstances and at all times said defendants were bound to anticipate that persons might drive automobiles onto said airport and across said runways, and said defendants were at all times required to use such ordinary care as would enable them to prevent persons from driving upon said airport or across said runways in motor vehicles.''

In practical juxtaposition with that language instruction No. 26 is in effect a statement by the court that appellant Carter as agent for the city of Santa Monica was guilty of an omission that in itself constituted negligence. Since that was a question for the jury to decide we feel that prejudicial error arose in the giving of both instructions, No. 24 and No. 26.

Among the thirty-four instructions numbered XVII to L, inclusive, submitted by the defendants and refused by the trial court, were a number which we feel should have been given as bearing upon the defendants' theory of the case. One of these, XXVI, we quote here.

''You are instructed that Weldon Van Gundy was not a servant or employee of either the defendant City of Santa Monica or the defendant E. R. Carter.''

Another is XXXVI:

''The negligence, if any, of the defendant Weldon Van Gundy at the time of the happening of the accident is not imputable to the defendant City of Santa Monica and the defendant E. R. Carter, and said defendants cannot be held responsible for any negligence, however gross, upon the part of said Van Gundy.''

Still another is instruction XXXVIII:

''If you believe from the evidence in this case that the defendant Weldon Van Gundy was guilty of negligence which was the sole and proximate cause of the collision, then you

will return your verdicts in favor of the defendants City of Santa Monica and E. R. Carter.''

Respondents contend that it was unnecessary for the court to give any of these last mentioned instructions, stating that: ''No issue was created by the evidence concerning whether or not Van Gundy was an agent or employee of appellants. It was not contended by respondents that Van Gundy's negligence was *imputed* to appellants; the evidence showed that appellants were guilty of their own independent acts of negligence.'' The complaint, however, alleged ''that the defendant Weldon Van Gundy was at all times herein mentioned in the employ of the defendant City of Santa Monica and defendant E. R. Carter for the purpose of working and aiding in the repair, improvement, maintenance and construction of said Clover Field Airport''; and from the transcript we quote the following questions by counsel for the respondents and answers given thereto by Mr. Johnson, the W.P.A. foreman:

''Q. What work or services did Mr. Carter perform on that project? A. Mr. Carter, as the city engineer, was the sponsor's representative in regard to construction, to the best of my knowledge. Q. And what did he do in that connection? A. He had charge of the city's saving clause, and gave any advice to us, as representative at the field, and as to the method, and as to the progress of the work. Q. Did he direct what work was to be done? A. Yes. Q. Did he direct how it was to be done? A. Yes, sir. Q. In what manner did you carry out his instructions? A. We did that only to the extent—well, we selected, or picked the personnel and of course I carried out his instructions; in other words the W.P.A. furnished the labor and had supervision over the labor, in regard to the discipline of the labor. Q. Mr. Carter direct the laborers in the performance of their work? A. Mr. Carter had a representative on the field; he was not there. Q. Well, did his representative direct where the work was to be done by the laborers? A. Yes, through the W.P.A. foreman.''

It was also brought out in the same inquiry that ''Mr. Carter or his representative directed the type of equipment that was to be used in connection with the work. The City of Santa Monica furnished a three-wheel, 12-ton roller and

tandem roller; a grader; two tractors and they had two shovels at two different times and five-sack concrete mixer and a one-sack mixer, scarifiers, fresnoes, tumble bug and a pair of mules at one time and some trucks. Mr. Van Gundy was a mixer operator. We used the concrete mixer for mixing emulsified asphalt. He was the operator on that concrete mixer which was supplied by the City of Santa Monica. The City of Santa Monica also furnished sand, cement, lumber, various oils and other equipment.'' The transcript discloses that the ''Mr. Carter'' mentioned in this examination is not the appellant Carter, but both were city employees, one, city engineer; the other, operating manager of the airport.

In view of the information elicited by respondents' counsel it is quite probable in our opinion that the jury may have been somewhat in the dark as to whether Van Gundy, working under the system described and using a city owned concrete mixer, was an agent or employee of the city. We believe, therefore, that instructions Nos. XXVI, XXXVI and XXXVIII should have been given.

Other instructions given or refused on the measure of damages form the basis of complaint on the part of appellants, but we deem it unnecessary to consider exceptions taken in this regard since the cause must be remanded for a new trial.

Judgments reversed and cause remanded.

Doran, Acting P. J., and White, J., concurred.

A petition for a rehearing was denied August 6, 1941, and respondents' petition for a hearing by the Supreme Court was denied August 28, 1941.